IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DIRECT STREAM, LLC,<br><br>               Debtor. | Chapter 7<br><br>Case No. 20-10534 (MFW) |
| In re:<br><br>DIRECT STREAM FEDERAL, LLC,<br><br>               Debtor. | Chapter 7<br><br>Case No. 20-10535 (MFW)<br><br>**Hearing Date:** May 6, 2020 at 2:00 p.m. (ET)<br>**Objection Deadline:** April 28, 2020 at 4:00 p.m. (ET) |

**MOTION OF SWOOP SEARCH, LLC FOR AN ORDER CONFIRMING EXTENT OF THE AUTOMATIC STAY AS TO THIRD-PARTY**

Swoop Search, LLC ("Swoop"), by and through its undersigned counsel, files this motion (the "Motion") to confirm that the automatic stay does not apply to non-debtor Brandon W. Freeman pursuant to 11 U.S.C. § 362(a), or, alternatively, for relief from the automatic stay pursuant to 11 U.S.C. §§ 105(a) and 362(d), Rule 4001 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

Swoop has counterclaims and third-party claims pending against Freeman, DirectStream, LLC ("DS"), and DirectStream Federal, LLC ("DS Federal," collectively with DS, the "Debtors") pending in Colorado District Court, Arapahoe County (the "Colorado Court"), Case No. 2019-CV-31895 (the "Colorado Litigation"). In the Colorado Litigation, Freeman has attempted to use the automatic stay of claims as to Debtors to prevent further litigation of the claims Swoop brought against him personally. Freeman's argument that the bankruptcy stay applies to him, a non-debtor, is inconsistent with section 362 of the Bankruptcy Code, which expressly states that the automatic

stay applies only to the "debtor." Moreover, Freeman's position is procedurally inappropriate as neither the Chapter 7 Trustee nor Freeman himself have commenced an adversary proceeding or filed a motion seeking to extend the automatic stay to Freeman. Even if such a proper request were made, no "unusual circumstances" exist warranting extension of the stay, particularly in the absence of any attempt by the Debtors to reorganize.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157. Venue for the Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a), 362(a), and 362(d) of the Bankruptcy Code, as supplemented by Bankruptcy Rule 4001 and Local Rule 4001-1.

## BACKGROUND

**I. SWOOP'S BUSINESS RELATIONSHIP WITH FREEMAN AND THE DEBTORS.**

3. In 2014, Freeman invested in Swoop, a commercial company focused on privately funding paradigm shift technology development. In June 2018, Freeman identified himself as one of Swoop's managers, a role he maintained until the end of 2018, when he withdrew.

4. In early 2016, Swoop began discussing with senior U.S. government officials a novel technology that would significantly increase the government's ability to protect networks and secure communications across compromised network links. Swoop was the architect of a set of innovative software capabilities to meet this need; one component of the technology involved a particular type of computer hardware. Freeman had recently obtained access to such hardware through his acquisition of SRC, LLC, the predecessor company to Debtor DS. Freeman introduced

Swoop to DS, and thereafter founded DS Federal for the purpose of engaging in government contracts with Swoop. Swoop and DS Federal signed a Teaming Agreement memorializing their business arrangement.

5. In early 2018, Swoop succeeded in generating two projects with the U.S. government relating to Swoop and DS's combined software/hardware technology stack. The two projects were entitled "MS FURY" and "INTREPID," respectively.

6. On MS FURY, the primary contractor with the government was Rincon Research Corporation ("Rincon"). Swoop was a subcontractor to Rincon, and DS Federal was a subcontractor to Swoop. In June 2018, Swoop and DS Federal signed the MS FURY Agreement, which laid out tasks and pricing terms for that project (the "MS FURY Agreement").

7. On INTREPID, Swoop was the primary contractor, and DS Federal was a subcontractor to Swoop. Also in June 2018, Swoop and DS Federal entered into a multi-phase contract with DS Federal for that project (the "INTREPID Agreement").

II. **CONTRACTUAL OBLIGATIONS AND FIDUCIARY DUTIES OWED TO SWOOP WERE BREACHED.**

8. During the MS FURY and INTREPID projects, Freeman showed clear signs of favoring DS (in which he owned a supermajority interest) over Swoop (in which he owned a minority interest). On multiple occasions, Freeman falsely represented to third parties, including the U.S. government, that DS owned all of the intellectual property in the combined technology stack, harming Swoop's standing with its business partners while falsely inflating DS's value to better position Debtors for acquisition. Following a meeting with a potential investor that questioned Debtors' intellectual property rights, Debtors' CEO (Todd Rooke), called Swoop's CEO (Paul Bottum) and demanded that Swoop transfer its IP to Debtors. Bottum refused. Swoop has alleged that Freeman directed Rooke to make that demand. Freeman also ordered Swoop's

3

bookkeeper to issue distributions from Swoop's bank account to Swoop's members (including himself) despite Bottum explicitly prohibiting those transactions.

9. In early 2019, DS Federal began to breach its duties to Swoop under both the MS FURY and INTREPID Agreements. DS Federal ultimately failed, and at times outright refused, to execute required deliverables under both contracts. Swoop has alleged that Freeman directed DS Federal to breach its contracts with Swoop.

10. Freeman and the Debtors also acted in bad faith. For instance, DS Federal not only failed to deliver its technology on schedule, but entirely failed to appear for a formal government test demonstration, despite confirming it would attend the demonstration just a few days prior. The Debtors' bad faith antics led Rincon to issue a stop work order on MS FURY, irrevocably harming Swoop's financial expectations under its contract with Rincon, and seriously damaging Swoop's reputation and goodwill with the Government.

11. A few months after the stop work order, Bottum and a special Government employee (Terry Halvorsen of Samsung Electronics) met with Freeman to secure his assurance that DS Federal would execute its obligations under the INTREPID Agreement. Freeman assured Bottum and Halvorsen that DS Federal would perform. Almost immediately thereafter, Freeman made clear to Swoop that DS Federal would not perform. To date, DS Federal has refused to work on any task for the second phase of the INTREPID Agreement.

12. Additionally, Freeman and Debtors actively interfered with Swoop's contract with Rincon on MS FURY. Freeman and his entities attempted to circumvent Swoop and work directly with Rincon, thereby encouraging Rincon to breach its contract with Swoop.

13. Freeman and his entities have also made false or misleading representations to the Government designed to destroy Swoop's reputation. For example, an officer of Debtors sent an

4

email to Government representatives on August 13, 2019, misrepresenting the INTREPID Agreement's terms. This directly contradicted previous communications to Swoop and caused serious damage to Swoop's reputation. People within the Government have expressed to Swoop that it will be extremely difficult for Swoop to recover its reputation and prospects with the Government in light of Debtors' and Freeman's actions

14. After Debtors spent months refusing to perform its contractual obligations, Bottum called Freeman. During this call, Swoop asked Freeman to stop interfering with the MS FURY and INTREPID Agreements, as well as Swoop's relationships with Rincon and the Government. After asking Swoop whether it planned to sue, Freeman responded that he would simply "roll up" Debtors if any suit was filed.

### III. DS FEDERAL COMMENCES THE COLORADO LITIGATION.

15. In spite of Freeman's threat, on August 14, 2019, DS Federal filed a preemptive lawsuit against Swoop seeking declaratory relief that DS Federal had no further obligations to work with Swoop under the Teaming Agreement, and that Swoop had breached the Teaming Agreement.

16. On September 28, 2019, Swoop brought state law counterclaims against DS Federal, and third-party claims against Freeman and DS. A true and correct copy of Swoop's counterclaim and third-party complaint is attached as **Exhibit B**. Swoop brought direct claims against Freeman and DS Federal, and additional claims asserted against parties as alter egos of the others. Swoop alleges that each party, directly or indirectly, breached the MS FURY and INTREPID Agreements, tortiously interfered with the Agreements, and breached the Agreements' covenants of good faith and fair dealing. Swoop further asserts that Freeman breached his fiduciary duty as a manager of Swoop.

17. Discovery in the Colorado Litigation began in early January. The parties have sent and responded to discovery requests, issued third-party subpoenas, and begun noticing depositions. Additionally, DS Federal, DS, and Freeman each brought motions to dismiss, which remain pending.

### IV. THE DEBTORS FILED FOR CHAPTER 7 BANKRUPTCY.

18. On March 5, 2020, the Debtors filed the above-captioned bankruptcy cases seeking Chapter 7 bankruptcy relief. The Colorado Litigation, including Swoop's third-party claims against Freeman, remains pending.

19. Since the filing of the Debtors' bankruptcy cases, Swoop has stayed litigating its counterclaims and third-party claims against the Debtors. Swoop has sought discovery from Freeman as part of its state law claims against Freeman. However, Freeman has refused to continue any portion of the Colorado Litigation, claiming that the Colorado Litigation is stayed as to Freeman based on the Debtors' bankruptcy filings. A copy of communications from Freeman's counsel laying out this position is attached hereto as **Exhibit C**. Swoop additionally sought clarification from the state court regarding whether the Colorado Litigation was administratively closed as to Freeman; the state court ordered that "[t]o the extent that the court has jurisdiction over any party that matter can go forward." A true and correct copy of the state court's clarification order is attached hereto as **Exhibit D**. Despite this, Freeman still contends that the claims against him personally cannot proceed due to the Debtors' bankruptcy filing.

**RELIEF REQUESTED**

20. Swoop respectfully requests that this Court enter an order, substantially in the form attached hereto as **Exhibit A**, confirming that the automatic stay does not apply to Freeman, a third-party. Alternatively, Swoop requests an order granting relief from the automatic stay in order to continue the prosecution of the claims between Swoop and Freeman in the Colorado Litigation.

**BASIS FOR RELIEF REQUESTED**

I. **THE AUTOMATIC STAY DOES NOT APPLY TO FREEMAN AS A NON-DEBTOR THIRD-PARTY.**

21. Section 362(a) of the Bankruptcy Code establishes that upon a bankruptcy filing an automatic stay springs into effect. Section 362(a) clearly provides that the automatic stay as to a continuation of any proceeding applies only to the "debtor," not third parties. 11 U.S.C. 362(a)(1). Courts have uniformly recognized that the bankruptcy stay does not apply to the debtor's owners, officers, or shareholders. *See, e.g.*, *In re Uni-Marts, LLC*, 399 B.R. 400, 415 (Bankr. D. Del. 2009).

22. DS and DS Federal have commenced Chapter 7 bankruptcy petitions before this Court. Freeman has not commenced any bankruptcy proceeding before this Court or any other court. Freeman is attempting to use these bankruptcy proceedings to follow through on his threat to "roll up" the Debtors and insulate himself from liability for his bad faith conduct. Swoop's claims against him can and should proceed under applicable law.

23. Accordingly, the stay does not bar Swoop from pursuing its claims against Freeman in the Litigation.

## II. IF PROPERLY REQUESTED, THE COURT SHOULD DENY ANY ATTEMPT TO EXTEND THE STAY TO FREEMAN.

24. Courts may extend the protections of the automatic stay to non-debtor third-parties if "unusual circumstances" are present, which may arise where (i) the non-debtor third-party and debtor share an identity of interest such that a suit against the non-debtor is essentially a suit against the debtor, and (ii) where the third-party suit will have an adverse impact on the debtor's reorganization efforts. *In re W.R. Grace & Co.*, 386 B.R. 17, 30 (Bankr. D. Del. 2008); *In re Uni-Marts, LLC*, 399 B.R. at 416.

25. Overall, the purpose of extending the stay to non-debtor third parties must be consistent with the stay itself, meaning that it is to "suspend actions that pose a serious threat to a corporate debtor's reorganization efforts." *In re Uni-Marts, LLC*, 405 B.R. 113, 127 (Bankr. D. Del. 2009).

26. To seek extension of the stay, the debtor must commence an adversary proceeding or, at minimum, file a motion. Fed. R. Bankr. P. 7001; *see In re Ripon Self Storage, LLC*, No. BAP EC-10-1325-HKID, 2011 WL 3300087, at *6 (B.A.P. 9th Cir. Apr. 1, 2011) ("[A]ny extension of the automatic stay to nondebtors does not occur automatically but requires the filing of an adversary proceeding requesting the bankruptcy court to act under § 105(a)."); *In re Hart*, 530 B.R. 293, 309 (Bankr. E.D. Pa. 2015) (same).

### A. No Party—Not the Chapter 7 Trustee, the Debtors, Nor Freeman—Have Sought to Extend the Stay to Freeman.

27. As described above, Freeman claims that the Debtors' bankruptcy cases stayed the continuation of the Colorado Litigation as to Swoop's claims against Freeman. However, upon filing for Chapter 7 relief, all interests and legal claims of the Debtors passed into their bankruptcy estates. 11 U.S.C. § 541(a). Pursuant to sections 701 and 704 of the Bankruptcy Code, it is now

the Chapter 7 Trustee—not the Debtors or Freeman—who controls any such interests or claims, including whether to assert that the automatic stay should extend to a third-party such as Freeman. Therefore, neither Freeman nor the Debtors themselves can now attempt to extend and enforce the automatic stay as to Freeman.

28.     Regardless of who may seek to extend the automatic stay to a non-debtor third party, that party bears the ultimate burden of proving the unusual circumstances necessary for such an extension.  *See, e.g.*, *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, No. 13 CIV. 4650 JFK, 2014 WL 4783008, at *3 (S.D.N.Y. Sept. 25, 2014) ("The movant bears the burden of demonstrating the need for such a stay.").  Here, neither the Chapter 7 Trustee, Freeman, nor the Debtors have actually sought such relief from the Court, let alone carried their burden to prove the need to extend the automatic stay to Freeman.

### B.      No "Unusual Circumstances" Exist Requiring the Extension of the Stay to Freeman.

29.     Even if the Chapter 7 Trustee, the Debtors, or Freeman had sought the extension of the automatic stay as to Freeman, no "unusual circumstances" exist in these cases requiring the extension of the automatic stay to Freeman.  First, no indemnification obligation on the part of the Debtors as to Freeman has been asserted in these bankruptcy cases or in the Colorado Litigation. *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986) (finding unusual circumstances where debtor and third party held an identity of interests due to debtors' duty to indemnify third party).  Indeed, no indemnification claim has been scheduled among the claims of either DS or DS Federal.  While Swoop's third-party complaint lists the Debtors as co-defendants on certain claims against Freeman, Swoop's claims against Freeman are independent claims.  In fact, Freeman himself has treated the claims against him as separate from those of the Debtors; he has separate counsel, has produced separate discovery, and filed his own motion to dismiss apart from those

9

filed by the Debtors. Freeman has argued, quite adamantly, that he is **<u>not</u>** the alter ego of the Debtors. Swoop acknowledges that any adjudication of a claim involving Freeman would not be binding upon the Debtors and their estates. Swoop intends to file a proof of claim in the Debtors' bankruptcy cases to seek recovery of its claims against them.

30. Second, the continuation of the Colorado Litigation against Freeman alone would not have an adverse impact on any reorganization efforts of the Debtors. The Debtors filed for Chapter 7 bankruptcy relief and are thus liquidating, not reorganizing. In fact, the Debtors disclosed that in the days leading up to the commencement of these cases (coincidentally, just weeks after discovery in the Colorado Litigation began), DS transferred all of its assets to another company affiliated with Freeman. Additionally, because the Chapter 7 Trustee—not the Debtors—are charged with administering the Debtors' bankruptcy estates, there is no risk that Freeman would be distracted from any reorganization efforts and thus jeopardize the Debtors' bankruptcy cases. Finally, as described above, Swoop can seek to recover from Freeman on its claims and any judgment against Freeman would not be binding on the Debtors.

31. In sum, no "unusual circumstances" exist that would allow the Court—on a proper request, which has not yet been made—to extend the automatic stay under 11 U.S.C. § 362(a) to stay the claims against Freeman. *See Gray v. Hirsch*, 230 B.R. 239, 243 (S.D.N.Y. 1999) (finding no unusual circumstances justifying the extending of the automatic stay to non-debtor owner). Swoop accordingly and respectfully requests that the Court grant the Motion and confirm that the automatic stay does not extend to Freeman as a non-debtor third-party.

**III. ALTERNATIVELY, SWOOP IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY TO PURSUE ITS STATE COURT CLAIMS AGAINST FREEMAN.**

    **A.    Standard for Relief from the Automatic Stay.**

32.    If the Court concludes that the automatic stay does extend to Freeman, Swoop is entitled for relief from the automatic stay in order to pursue its claims against Freeman in the Colorado Litigation. The filing of a petition for relief under Chapter 7 of the Bankruptcy Code operates as a stay of certain actions against the estate or property of the estate, including actions against a debtor that previously were, or could have been, commenced and acts to obtain possession of, exercise control over, or enforce a lien against property of the estate. 11 U.S.C. § 362(a). The Bankruptcy Code provides, however, that the Court "shall grant relief" from the automatic stay under certain circumstances, including "for cause." 11 U.S.C. § 362(d)(1).

33.    Although "cause" is not defined in the Bankruptcy Code, Delaware courts have held that the term is a flexible concept determined on a case-by-case basis by examining the totality of the circumstances.

34.    This Court has developed a three-prong balancing test in order to determine whether to grant relief from the stay:

    a.    Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;

    b.    Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and

    c.    The probability of the creditor prevailing on the merits.

*In re SCO Grp., Inc.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007).

35. This Court has also considered general policies of the automatic stay when determining whether to grant relief from stay, including:

    a. whether relief would result in a partial or complete resolution of the issues;

    b. lack of any connection with or interference with the bankruptcy case;

    c. whether the other proceeding involves the debtor as a fiduciary;

    d. whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

    e. whether the debtor's insurer has assumed full responsibility for defending it;

    f. whether the action primarily involves third parties;

    g. whether litigation in another forum would prejudice the interests of other creditors;

    h. whether the judgment claim arising from the other action is subject to equitable subordination;

    i. whether the moving party's success in the other proceeding would result in a judicial lien avoidable by the debtor;

    j. the interests of judicial economy and the expeditious and economical resolution of litigation;

    k. whether the parties are ready for trial in the other proceeding; and

    l. impact of the stay on the parties and the balance of the harms.

*Id.* (citing *In re Sonnax Indus., Inc. v. Tri Component Prods. Corp.*, 907 F.2d 1280, 1287 (2d Cir. 1990)).

### B. Swoop is Entitled to Relief from the Automatic Stay as to Freeman.

36. Here, Swoop is entitled to relief form the automatic stay under section 362(d)(1). First, allowing the Colorado Litigation to proceed as to Freeman will not prejudice the Debtors'

estates. The only purpose of the requested relief is to allow Swoop to seek redress for its state law claims against Freeman, a non-debtor third-party. These claims against Freeman are not part of the Debtors' bankruptcy estates, and will not be discharged in the Debtors' Chapter 7 cases. Moreover, as discussed in detail above, allowing Swoop to continue litigation against Freeman in state court would have no adverse effect on the rights of the Debtors' bankruptcy estates or the administration of those estates, as the claims would continue only against Freeman. The Chapter 7 Trustee, not Freeman or the Debtors, now administers the estates.

37. In contrast to the Debtors' bankruptcy estate, denial of relief from stay will result in significant hardship for Swoop. At the time that the Debtors filed for bankruptcy, Swoop had already spent significant time and resources in the Colorado Litigation, and is in the middle of completing discovery as to its claims against Freeman. Delaying the continuation of the Colorado Litigation as to Freeman risks the loss of evidence, including deponents' or witnesses' recollections of the relevant facts. Additionally, denying Swoop relief from the stay would ultimately deny Swoop the right to pursue its rightful state law claims against a non-debtor third-party in Colorado state court. In contrast, allowing the continuation of the Colorado Litigation as to Freeman would allow for the full resolution of all of Swoop's claims against Freeman, whether in its favor or against it.

38. Third, Swoop is likely to prevail on the merits of its claims against Freeman. The facts of the Colorado Litigation to be proven in that forum show that Freeman, in bad faith, intentionally breached or interfered with the MS FURY and INTREPID Agreements and Swoop's subcontract with Rincon, and breached his fiduciary duties to Swoop. Consequently, Swoop has the met the minimum standard of a "slight probability of success on the merits" found to be

13

sufficient in meeting this prong. *See In re SCO Grp., Inc.*, 395 B.R. 852, 859 (Bankr. D. Del. 2007).

39. Accordingly, and in the alternative, the Court should grant Swoop's motion for relief from stay in order to pursue its claims against Freeman in the Colorado Litigation.

## **NO PRIOR REQUEST**

40. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, confirming that the automatic stay does not apply to Freeman.

Dated:  April 14, 2020              **MORRIS JAMES LLP**

*/s/ Eric J. Monzo*
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware  19801
Telephone:  (302) 888-6800
Facsimile:  (302) 571-1750
E-mail:  emonzo@morrisjames.com
E-mail:  bkeilson@morrisjames.com


and

Ryan T. Murphy (#0311972)
Samuel M. Andre (MN #0399669)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone: (612) 492-7000
E-mail: rmurphy@fredlaw.com
E-mail: sandre@fredlaw.com

*Attorneys for Swoop Search, LLC*