# EXHIBIT 1

## (Settlement Agreement)

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into by and between Don A. Beskrone, solely in his capacity as chapter 7 trustee ("Trustee") of the debtors identified below and their respective estates (the "Estates"), on the one hand, and FG SRC LLC ("FG SRC"), on the other hand, who, by so executing this Agreement, respectively agree, subject to Bankruptcy Court (as defined below) approval, to be bound by each of its terms, conditions and obligations as of the Effective Date.

## RECITALS

**WHEREAS**, on March 5, 2020 (the "Petition Date"), DirectStream, LLC ("DS LLC") and DirectStream Federal, LLC ("DSF LLC") each filed voluntary petitions for relief under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), thereby commencing Case Nos. 20-10534 and 20-10535 in the Bankruptcy Court (the "Bankruptcy Cases"); and

**WHEREAS**, the Trustee is the duly appointed and serving chapter 7 bankruptcy trustee for debtors DS LLC and DSF LLC (collectively, the "Debtors") in the Bankruptcy Cases; and

**WHEREAS**, FG SRC contends that it was owed not less than $47.5 million pursuant to that certain Revolving Convertible Promissory Note (as amended, amended and restated, supplemented or otherwise modified from time to time (the "Note")) dated as of August 5, 2019 in favor of FG SRC, as lender, and DS LLC, as borrower, which was secured by that certain Pledge, Assignment, and Security Agreement by and among DS LLC, as borrower, and FG SRC, as lender, dated as of February 5, 2016 (the "Security Agreement");

**WHEREAS**, FG SRC contends that the Note, including all advances made thereafter pursuant to the Note and all other liabilities and obligations of DS LLC to FG SRC are secured by perfected liens on and security interests in the property of DS LLC as described in the Security Agreement (the "Collateral") for the benefit of FG SRC; and

**WHEREAS**, FG SRC contends that certain events of default have occurred and are continuing under the Note and other loan documents as of January 22, 2020; and

**WHEREAS**, FG SRC contends that pursuant to that certain Agreement For Strict Foreclosure In Partial Satisfaction Of Obligation (the "Foreclosure Agreement") (attached hereto as **Exhibit "A"**) between FG SRC as lender and DS LLC as borrower, DS LLC agrees to sell, convey, assign, transfer, and deliver to FG SRC or its designee, pursuant to Section 9-620 of the UCC, all of DS LLC's right, title, and interest in and to the Collateral (as defined in the Foreclosure Agreement), free and clear of all liens, in consideration for the permanent extinguishment, cancellation, and release of the loan in an aggregate principal amount equal to $22,000,000.00, which is the approximate tax basis of the DS LLC's assets and inventory value as of December 31, 2019, subject to survival of (i) remaining obligations under the loan documents, (ii) FG SRC's lien on and security interests in the remaining Collateral under the loan documents, and (iii) all other rights of FG SRC under the loan documents; and

**WHEREAS**, FG SRC contends that pursuant to the Foreclosure Agreement, FG SRC now owns and controls the Collateral as more fully described in (i) Schedule 1 of the Foreclosure Agreement, (ii) that certain Patent Assignment Agreement (Exhibit 2 to the Foreclosure Agreement), and (iii) the Addendum to the Foreclosure Agreement; and

**WHEREAS**, FG SRC contends that after giving effect to the Foreclosure Agreement, FG SRC is owed not less than $26,089,406.59 by the Debtors; and

**WHEREAS**, the Trustee has investigated the facts and circumstances of the Foreclosure Agreement; and

**WHEREAS**, the Trustee has investigated potential claims and causes of action against FG SRC, including but not limited to claims and causes of action under (i) Chapter 5 of the Bankruptcy Code, and (ii) Rule 7001 of the Federal Rules of Bankruptcy Procedure, including but not limited to, proceedings to avoid and/or recover money, property or the value of such property, and proceedings to determine the validity, priority or extent of a lien or other interest in property (collectively, the "Claims"); and

**WHEREAS**, FG SRC contends that the Foreclosure Agreement is valid and fully enforceable against the Debtors and other third parties and denies that it is liable on the Claims and has asserted certain defenses thereto; and

**WHEREAS**, the Trustee and FG SRC (collectively, the "Parties") wish to resolve the disputes between them in order to avoid the costs and uncertainties of litigation;

**NOW, THEREFORE**, in consideration of the promises, covenants and representations set forth herein, the sufficiency of which is hereby acknowledged and confessed, the Parties hereby expressly agree, subject to Bankruptcy Court approval, as follows:

## TERMS OF SETTLEMENT

**A.    Payment Terms, Prosecution of Litigation and Sharing of Proceeds and Mutual Releases**

1.    Rule 9019 Approval by the Bankruptcy Court. Promptly following execution and delivery of this Agreement by all Parties, but not later than five (5) business days thereafter, Trustee shall file a motion with the Bankruptcy Court seeking approval of this Agreement and the settlement between the Trustee and FG SRC as set forth in this Agreement (the "9019 Motion"). Trustee shall provide FG SRC and its counsel with the 9019 Motion not less than two (2) business days before the filing of same. The 9019 Motion shall be approved by FG SRC prior to its filing.

2.    Payment of Settlement Amount. By no later than fifteen (15) days after the entry of a Final Order (as defined below) by the Bankruptcy Court granting the 9019 Motion and approving this Agreement, FG SRC shall pay $115,000.00 (the "Settlement Amount") to the Trustee for the benefit of the Estate of DS LLC. Such payment, if by check, shall be made payable to "Don A Beskrone, Chapter 7 Trustee" and shall be delivered to counsel for the Trustee, Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, DE 19899.

The "Settlement Satisfaction Date" shall be the later of the date on which the Settlement Amount has been received by the Trustee in good funds or the date on which such payment clears the applicable bank account of Trustee if made by check. "Final Order" shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

3.     Release of Funds. The Trustee is in the possession of certain funds (approximately $50,000) maintained in certain accounts that were the subject of the Foreclosure Agreement and which FG SRC contends is Collateral under the Foreclosure Agreement. By no later than fifteen (15) days after the entry of a Final Order by the Bankruptcy Court granting the 9019 Motion and approving this Agreement, such funds shall be released from any lien, claim or encumbrance of FG SRC, and the Trustee may transfer and deposit such funds in the Trustee's account. FG SRC shall reasonably cooperate in ensuring the transfer and release of the funds to the Trustee.

4.     Completion of Tax Returns. The Trustee shall undertake the prompt preparation and submission of the Debtors' federal and state tax returns, if any, for the years 2019 and 2020. The Debtors' prior accountants, Eide Bailly (the "Prior Accountants") shall assist the Trustee's accountants, Bederson LLP, and provide documents/information as may be necessary for Bederson to prepare, complete and file, as appropriate, such tax returns. The fees and expenses, if any, of the Prior Accountants shall be borne by FG SRC.

5.     Prosecution and Sharing of Proceeds from Existing Claims. FG SRC shall use reasonable efforts to prosecute those certain Existing Claims (as defined in the Addendum to the Foreclosure Agreement) and any other claims involving patents or other intellectual property (collectively, the "IP"), including actions against Intel Corporation and Xilinx, Inc., held, owned or controlled by the Debtors and that was foreclosed upon and/or assigned to FG SRC as part of or in connection with the Foreclosure Agreement (collectively, the "Litigations"); provided FG SRC shall not be obligated to commence or continue prosecuting any of the Existing Claims or any other claims involving the IP if FG SRC determines that the costs, expenditures, or efforts necessary or required or advised by counsel to continue any such prosecution exceeds the potential benefits of the applicable Litigations.

The estate of DS LLC shall receive a 10% interest in and/or distribution from (on a net basis, including, for the avoidance of doubt, net of such reasonable and documented expenses incurred by FG SRC) any funds or value received by FG SRC in the event or as a result of a judgment, settlement, resolution or other occurrence resulting in the distribution of funds or receipt of value (i) in the Litigations (whenever concluded or resolved), (ii) from any prospective or future litigation involving or concerning any of the IP (commenced during the period that is 2 years after the Effective Date of this Agreement) and (iii) from any licensing, sale, royalties, use and/or disposition of the IP (for a period of 2 years from the Effective Date of this Agreement) (all of the foregoing scenarios in which a distribution is made to and received by the estate of DS LLC, a "Return"). Notwithstanding the right to the prospect of a Return, FG SRC as owner of the Collateral shall have exclusive control of all current Litigations and future litigations, the right to settle or dismiss any of the Litigations or any future litigations with respect to the IP, or other use/disposition of the IP. FG SRC shall keep the Trustee reasonably informed of the Litigations and any future litigations, and on any proposed settlement or other resolution thereof, and any licensing, sale, royalties, use and/or disposition of the IP.

6.     FG SRC Allowed Claims. FG SRC shall have an allowed general unsecured deficiency claim against the Debtors' Estates in the amount of $26,089,406.59 (the "FG SRC GUC"). While the FG SRC GUC is allowed against both of the Debtors' Estates, the total amount of any distributions on account of the FG SRC GUC shall not exceed the total claim amount of the FG SRC GUC. In the event of a Return received by the Debtors' Estates, the FG SRC GUC shall share *pari passu* with all other allowed general unsecured claims against the Debtors' Estates. In the event no Return is received by the Debtors' Estates, 50% of the FG SRC GUC shall be subordinated to allowed general unsecured claims, and the remaining 50% shall share *pari passu* with all other allowed general unsecured claims against the Debtors' Estates. The FG SRC GUC shall not be subject to reconsideration.

7.     Release of FG SRC. Effective as of the Settlement Satisfaction Date, the Trustee, the Debtors and their Estates, and each of the Trustee's predecessors, successors, assigns, partners, officers, directors, employees, representatives, and agents, hereby release FG SRC, and each of FG SRC's

predecessors, successors, assigns, partners, officers, directors, employees, representatives, and agents (collectively, the "FG SRC Parties") from any and all actions, omissions, duties, obligations, liabilities, losses, causes of action, debts, accounts, covenants, agreements, promises, damages, claims, demands, fees and costs of any nature whatsoever, in law or in equity, whether direct or contingent, asserted or unasserted, known or unknown, suspected or unsuspected, choate or inchoate, which the Trustee, the Debtors and their estates or any of them, ever had, now have, or can, shall or may have or hold against the FG SRC Parties, that arise out of, are based upon, could have been asserted, involve, relate to, or concern in any way, the Claims or the Foreclosure Agreement; *provided, however*, that said release shall not constitute nor be deemed to constitute a release or waiver of any of the rights obtained by, or any of the obligations imposed upon, the Parties pursuant to this Agreement. For the avoidance of doubt, the Trustee and the Estates reserve all claims and causes of action against non-FG SRC Parties.

8. Release of the Trustee and the Estates. Effective as of the Settlement Satisfaction Date, FG SRC, and each of the FG SRC's predecessors, successors, assigns, partners, officers, directors, employees, representatives, and agents, hereby release the Estates, the Trustee, and each of the Estates' and Trustee's predecessors, successors, assigns, partners, officers, directors, employees, representatives, and agents (collectively, the "Trustee Parties") from any and all actions, omissions, duties, obligations, liabilities, losses, causes of action, debts, accounts, covenants, agreements, promises, damages, claims, demands, fees and costs of any nature whatsoever, in law or in equity, whether direct or contingent, asserted or unasserted, known or unknown, suspected or unsuspected, choate or inchoate, which FG SRC ever had, now have, or can, shall or may have or hold against the Trustee Parties, that arise out of, are based upon, could have been asserted, involve, relate to, or concern in any way, the Claims or the Foreclosure Agreement; *provided, however*, that said release shall not constitute nor be deemed to constitute a release or waiver of any of the rights obtained by, or any of the obligations imposed upon, the Parties pursuant to this Agreement, including but not limited to the FG SRC GUC. For the avoidance of doubt, FG SRC waives any claim or demand against the Estates in excess of the FG SRC GUC.

9. Claims against Swoop Search, LLC. Effective as of the Settlement Satisfaction Date, the Trustee shall assign to FG SRC all claims and causes of action the Debtors may have against Swoop Search, LLC, including those asserted by the plaintiff Debtor DSF LLC in that certain litigation captioned "DirectStream Federal, LLC v. Swoop Search, LLC" pending in the District Court, Arapahoe, Colorado, Case No. 2019CV31895. Upon assignment of such claims and causes of action, FG SRC shall be entitled to and is otherwise authorized to compromise and settle such claims and causes of action, including but not limited to dismissing or withdrawing such claims and causes of action as part of any settlement with the defendant Swoop Search, LLC. As part of any such settlement, FG SRC shall secure the release and/or withdrawal of any claim by Swoop Search, LLC against the Debtors and the Estates.

10. Trustee Consent to Lift Stay. The Trustee consents to and otherwise agrees that any stay or order enjoining the prosecution of the Litigations shall be vacated and/or modified to permit the Litigations to proceed to conclusion as contemplated by paragraph 5 above and the provisions of this Agreement. The Trustee shall file the appropriate motion to seek relief from the Bankruptcy Court in the Bankruptcy Cases to obtain the vacatur and/or modification of any stay or order enjoining the Litigations.

**B.    General Provisions**

1. Effective Date of Agreement. The "Effective Date" of this Agreement shall be the date on which the Bankruptcy Court shall have entered a Final Order approving this Agreement.

2. No Admissions. The Parties understand and acknowledge that this Agreement is in compromise of disputed claims and defenses. Therefore, neither this Agreement, nor any of its provisions, shall constitute, or be deemed to constitute, an admission as to liability on any of the claims referenced herein, the viability of any defenses to such claims, or otherwise.

3.    Warranty of Authority. Each of the signatories hereto hereby warrants that he has the authority to execute this Agreement on behalf of the Party for whom he is signing.

4.    Ownership of Claims.    FG SRC hereby warrants that the rights and or interests asserted by FG SRC, if any, that are the subject matter hereof are owned by FG SRC, and have not been assigned, transferred, or sold. The Trustee represents that he is the owner of the claims and causes of action asserted by DSF LLC identified in paragraph 9 above.

5.    Entire Agreement. This Agreement is the complete and final agreement of the Parties as to all of the matters set forth herein, and supersedes all previous and contemporaneous agreements, promises, covenants, negotiations, discussions, understandings and representations by and/or between the Parties, all of which have become merged and integrated into this Agreement. The Parties hereby acknowledge that there are no other written or oral agreements between them concerning the matters set forth in this Agreement.

6.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties' respective heirs, representatives, successors and assigns.

7.    Terms Understood. Each Party represents that prior to execution of this Agreement, such Party was fully informed of its terms, contents, conditions and effects, and that such Party had the benefit and advice of counsel of its own choosing in entering into this Agreement. Each Party further represents that it relied solely and exclusively on its own judgment and the advice of its own counsel in entering into this Agreement.

8.    Governing Law. This Agreement shall be governed by and interpreted pursuant to the laws of the State of Delaware. The Bankruptcy Court shall retain exclusive jurisdiction, to the greatest extent permitted by law, over any and all disputes regarding this Agreement, its interpretation and its enforcement.

9.    Headings. Sections, subheadings and titles used in this Agreement are for convenience only and shall not affect interpretation of this Agreement.

10.    Modifications. This Agreement shall not be modified except by an instrument in writing signed by the Party against whom the enforcement of any modification is sought.

11.    Counterparts. The Parties may execute this Agreement in multiple counterparts, each of which shall be deemed an original, and all of which, when taken together, shall constitute but one and the same instrument. The facsimile or PDF image of an originally-signed signature page shall serve as, and constitute, an originally-executed copy of such signature page.

**SO EXECUTED** as of this 28th day of January, 2021.


_____
**DON A. BESKRONE, TRUSTEE**


**FG SRC LLC**


By: _____


{01656183;v3 }    SETTLEMENT AGREEMENT – Page 5

# **EXHIBIT A**

## **(Foreclosure Agreement)**

## AGREEMENT FOR STRICT FORECLOSURE
## IN PARTIAL SATISFACTION OF OBLIGATIONS

This AGREEMENT FOR STRICT FORECLOSURE IN PARTIAL SATISFACTION OF OBLIGATIONS (the "Agreement") is entered into as of January 22, 2020, by and among FG SRC LLC, a Delaware limited liability company ("Lender") and DirectStream, LLC, a Delaware limited liability company ("Borrower"). Capitalized terms used but not defined herein have the meanings ascribed to them in the Note (as defined below), as applicable.

## RECITALS

**WHEREAS**, Borrower entered into a Revolving Convertible Promissory Note dated as of August 5, 2019, in favor of Lender (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Note"), which Note evidences the terms and conditions of a loan in the original principal amount of $45,000,000 (said loan, including all advances made thereafter pursuant to the Note, referred to herein as the "Loan");

**WHEREAS**, pursuant to the terms of that certain Pledge, Assignment, and Security Agreement by and among Borrower and Lender dated as of February 5, 2016 (the "Security Agreement"), the Loan and all other liabilities and obligations of Borrower to Lender (the "Borrower Obligations") are secured by perfected liens on and security interests in the property of the Borrower as described in the Security Agreement (the "Collateral") for the benefit of the Lender under the Loan Documents, and as further described in the Addendum attached hereto, whereby Borrower acknowledges that the Collateral includes the claims described therein;

**WHEREAS**, certain Events of Default have occurred and are continuing under the Note and the other Loan Documents as of the date hereof;

**WHEREAS**, by this Agreement, Borrower agrees to sell, convey, assign, transfer, and deliver to Lender or its designee, pursuant to Section 9-620 of the UCC (as defined below), all of Borrower's right, title, and interest in and to the Collateral, free and clear of all liens, in consideration for the permanent extinguishment, cancellation, and release of the Loan in an aggregate principal amount equal to $22,000,000.00, which is the approximate tax basis of the Borrower's assets and inventory value as of December 31, 2019 (the "Specified Loans"), subject to survival of (i) remaining Obligations under the Loan Documents, (ii) Lender's lien on and security interests in the remaining Collateral under the Loan Documents, and (iii) all other rights of the Lender under the Loan Documents (together, the "Remaining Obligations");

**WHEREAS**, in the ten (10) days prior to execution of this Agreement, Lender conducted a lien search in the appropriate office in which to file a financing statement with respect to the Collateral and, as a result of such lien search and other inquiries, it was determined that, other than Lender, there is no other known secured party or lienholder that held a security interest in the Collateral perfected by: (i) the filing of a financing statement; or (ii) compliance with a statute, regulation, or treaty described in Section 9-311(a) of the UCC; and

**WHEREAS**, as of the date hereof, the Lender has not received an authenticated notification of a claim of an interest in the Collateral and, accordingly, there was no party to whom a notice was to be issued under Section 9-621(a) of the UCC, and no such notice was issued.

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**AGREEMENT**

1.  <u>Recitals Incorporated</u>.  The recitals and prefatory paragraph set forth above are hereby incorporated in full, and made a part of, this Agreement.

2.  <u>Definitions; Rules of Construction</u>.  Defined terms may be used in the singular or the plural, as the context requires.  The words "include," "includes," and "including" are deemed to be followed by the phrase "without limitation."  Unless the context in which it is used otherwise clearly requires, the word "or" has the inclusive meaning represented by the phrase "and/or."  References to Sections and Exhibits are to Sections and Exhibits of this Agreement unless otherwise expressly provided.  All incorporations by reference of provisions from other agreements are incorporated as if such provisions were fully set forth into this Agreement, and include all necessary definitions and related provisions from those other agreements. All provisions from other agreements incorporated into this Agreement by reference survive any termination of those other agreements until obligations of the Borrower under this Agreement and the Loan Documents are irrevocably paid or otherwise satisfied in full.  All references to the Uniform Commercial Code are deemed to be references to the Uniform Commercial Code in effect in the State of Delaware as of the date of this Agreement (the "<u>UCC</u>").  Unless the context in which it is used otherwise clearly requires, all references to days, weeks, and months mean calendar days, weeks, and months.

3.  <u>Strict Foreclosure of Collateral</u>.

3.1  <u>Transfer by Borrower and Acceptance by Lender of Collateral</u>.[1]  Pursuant to Section 9-620 of the UCC and other applicable laws, Borrower hereby voluntarily sells, conveys, assigns, transfers, and delivers to Lender all of the legal, equitable, and beneficial right, title, and interest of Borrower in and to the Collateral, including the claims described in the Addendum attached hereto, and all proceeds thereof, free and clear of all liens (the "<u>Transfer</u>"), in consideration for the permanent extinguishment, cancellation, and release of the Specified Loans by the Lender, subject to survival of the Remaining Obligations. Pursuant to Section 9-620 of the UCC and other applicable laws, Lender hereby accepts the sale, conveyance, assignment, transfer, and delivery from Borrower of all of its legal, equitable, and beneficial right, title, and interest in and to the Collateral, including the claims described in the Addendum attached hereto, and all proceeds thereof, free and clear of all Liens, in consideration for the permanent extinguishment, cancellation, and release of the Specified Loans, subject to survival of the Remaining Obligations.

3.2  <u>Effect of Transfer and Acceptance of Collateral</u>.  The parties acknowledge and agree that the sale, conveyance, assignment, transfer, and delivery of the Collateral and all proceeds thereof hereunder by Borrower, and Lender's acceptance of the same, shall be in consideration for the permanent extinguishment, cancellation, and release by the Lender of the Specified Loans, subject to survival of the Remaining Obligations pursuant to Section 9-620 and other applicable laws.  Borrower: (i) agrees it has received notice sufficient for compliance with Sections 9-611, 9-620, and 9-621 of the UCC and, in the alternative, hereby expressly waives (a) any requirement for receipt of such notice and any right to notification of sale, conveyance, assignment, transfer, or delivery of the Collateral pursuant to Sections 9-620 and 9-621 of the UCC or otherwise, and (b) any remedies, rights, defenses, or actions they might have as a result of failure to have received such notice; (ii) waives any right of redemption under Section 9-623 of the UCC or otherwise; (iii) waives any right to object to the sale, conveyance, assignment, transfer, or delivery of the Collateral pursuant to Section 9-620 of the UCC or otherwise; (iv) waives any obligation the Lender may have to dispose of the Collateral; (v) waives any other rights, whether legal or equitable, which it may possess in and to the Collateral; (vi) agrees the transactions contemplated herein are

---

[1] Solely for purposes of this Agreement, the definition of Collateral and all references thereto shall not include any ownership interest of the Borrower in DirectStream Federal, LLC.

consummated in good faith and are commercially reasonable and (vii) waives any prior notice period set forth in the UCC or other applicable law. Borrower acknowledges and agrees the waivers herein constitute material consideration for the permanent extinguishment, cancellation, and release of the Specified Loans.

3.3     <u>Compliance with Sections 9-620 and Other Applicable Laws</u>. All parties hereto agree the transfer and acceptance of Collateral hereunder is consummated and effective pursuant to Sections 9-620, 9-621, and 9-622 of the UCC, and is conducted in good faith.

4.     <u>Representations, Warranties, Covenants, and Acknowledgments of Borrower</u>.   Borrower represents, warrants, covenants, and acknowledges:

4.1     <u>Approval; Binding Effect</u>.   Borrower has obtained all necessary corporate and limited liability company authorizations and approvals required for the execution and delivery of this Agreement and all documents executed in connection herewith (the "<u>Transaction Documents</u>") to which it is a party, and the consummation of the transactions contemplated hereby and thereby. This Agreement has been duly executed and delivered by Borrower and constitutes the legal, valid, and binding obligation of such party, enforceable against it in accordance with its terms, except to the extent such enforcement is limited by principles of equity and laws relating to bankruptcy and creditors' rights. Borrower has the absolute and unrestricted right, power, authority, and capacity to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party. Neither the execution and delivery of this Agreement or the other Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby and thereby will (i) violate or conflict with any provision of the certificate of incorporation, by-laws, certificate of formation, operating agreement, or any other organizational documents of Borrower, or (ii) violate or conflict with any provision of any law, rule, regulation, order, permit, certificate, writ, judgment, injunction, decree, determination, award, or other decision of any court, government, governmental agency or instrumentality, domestic or foreign, or arbitration by which Borrower is bound or affected. The execution of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby do not and will not require any filing or registration with, consent, or authorization or approval of, or notice to, or other action with or by, any court, legislature, agency, board, bureau, commission, instrumentality of a legislative, administrative, or regulatory body (in each case whether federal, state, local, foreign, or domestic or any agreement), or other person and are within the authority of the individual who shall execute this Agreement on behalf of Borrower.

4.2     <u>Pending Litigation; No Prohibitive Litigation</u>.   Other than the pending third-party claim by Swoop Search, LLC against Borrower for monetary damages, filed on September 18, 2019 in the District Court of Arapahoe County, Colorado, in connection with Case Number 2019CV31895, Borrower is not aware of any pending litigation, judgments, actions, or orders ("<u>Litigation/Orders</u>") outstanding against it or any of its property, nor is there any Litigation/Order pending or, to the best of such party's knowledge, threatened against it which is reasonably likely to make illegal, or to otherwise restrain, prohibit, or materially delay the consummation of the transactions contemplated by this Agreement or the other Transaction Documents.

4.3     <u>No Duress</u>.   Borrower knowingly and freely has entered into this Agreement without any duress, coercion, or undue influence exerted by or on behalf of the Lender, and Borrower has other legal options available to it. Borrower is not acting on any representation, understanding, or agreement not expressly set forth in this Agreement or the other Transaction Documents.

4.4     <u>Validity of Obligations</u>.   Immediately prior to the closing of the transactions hereunder, (i) the aggregate outstanding principal amount of the Loan was $46,653,635.19; and (ii) the amount of interest on the unpaid principal balance of the Note was $895,848.27.

4.5     <u>Validity and Enforceability of Liens and Security Interests</u>.  Immediately prior to the closing of the transactions hereunder, the Lender held valid, enforceable, and properly perfected first priority liens on and security interests in the Collateral.  Borrower does not directly or indirectly, dispute (or support any argument that disputes), in any judicial, administrative, or other proceeding the validity, priority, enforceability, or extent of liens on and security interests in the Collateral held by the Lender as of the date of this Agreement.

4.6     <u>Entitlement to Exercise Remedies</u>.  Unwaived or uncured Defaults and Events of Default have occurred and continue to exist, and the Lender is, as of the date of this Agreement, entitled under the Note and other Loan Documents to exercise enforcement rights and remedies under such documents and applicable law.

4.7     <u>No Competing Interests in Collateral</u>.  As of the date of this Agreement, no party other than the Lender has any other claims or interests in the Collateral.

4.8     <u>No Breach</u>.  As of the date of this Agreement, Lender has not breached any obligation to Borrower in connection with the Loan Documents, and Lender has fully performed all obligations it may have had or now has to Borrower under such documents.

4.9     <u>No Transfer of Interest</u>.  Borrower represents that it has not heretofore sold, assigned, transferred, subordinated, or participated to any person or entity the Collateral, nor has Borrower heretofore entered into any agreement (whether written or oral) to sell, assign, transfer, subordinate, or participate to any person or entity, any of its interests, rights, or claims in the Collateral that is being altered, transferred, sold, released, or otherwise affected by this Agreement.

4.10    <u>Brokers</u>.  Except as set forth herein, Borrower has not retained, utilized, or been represented by any broker or finder in connection with the transactions contemplated by this Agreement.

4.11    <u>Good Faith</u>.  Borrower believes the Lender has acted and is acting in good faith (as such term is defined in Section 1-201(b)(20) of the UCC) in connection with this Agreement and the transactions contemplated hereby.

5.      <u>Representations and Warranties of Lender</u>.  Lender represents, warrants, and covenants:

5.1     <u>Approval; Binding Effect</u>.  Lender has obtained all necessary corporate and limited liability company authorizations and approvals required for the execution and delivery of the Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by Lender and constitutes the legal, valid, and binding obligation of such party, enforceable against it in accordance with its terms, except to the extent that such enforcement is limited by principles of equity and laws relating to bankruptcy and creditors' rights.  Lender has the absolute and unrestricted right, power, authority, and capacity to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party.  Neither the execution and delivery of this Agreement or the other Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby and thereby will (i) violate or conflict with any provision of the certificate of incorporation, by-laws, certificate of formation, operating agreement, or any other organizational documents of such party, or (ii) violate or conflict with any provision of any law, rule, regulation, order, permit, certificate, writ, judgment, injunction, decree, determination, award, or other decision of any court, government, governmental agency or instrumentality, domestic or foreign, or arbitration by which such party is bound or affected.  The execution of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby are within the authority of the individual who shall execute this Agreement on behalf of Lender.

6.    Bankruptcy Matters.

6.1    Borrower acknowledges that:

(a)    If Borrower fails to perform its obligations under this Agreement and files, or has filed against it, a case under the Bankruptcy Code, such a filing could delay Lender's disposition of the collateral. In that event, Lender has good cause for obtaining relief from the automatic stay imposed by Section 362 of Title 11 of the Bankruptcy Code or any similar provision of law, including any right to seek relief under Section 105 of the Bankruptcy Code;

(b)    The Collateral is not necessary to an effective reorganization of Borrower because an effective reorganization is not possible; and

(c)    Borrower cannot provide "adequate protection" (as defined in Section 362(d)(1) of the Code) of Lender's security interest in the Collateral.

6.2    Borrower makes the foregoing acknowledgments with the understanding and desire that they be treated as admissions in connection with any proceeding for relief from the automatic stay or any similar provision of law seeking leave to foreclose or exercise any remedy against the Collateral in any subsequent bankruptcy proceeding that involves Borrower.

6.3    Based on the foregoing factual background, Borrower agrees that, in the event that it shall (i) file or seek in any future Chapter 11 case (or any other case filed under the Bankruptcy Code by or against Borrower) any relief to modify or limit Lender's rights hereunder in any Bankruptcy Court of competent jurisdiction; (ii) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator; or (iii) be the subject of any order, judgment or decree entered by any court of competent jurisdiction approving a petition filed by or against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal or state law relating to bankruptcy, insolvency or relief for Borrower, then Lender shall thereupon by entitled to relief from:

(a)    any automatic stay imposed by Section 362 of Title 11 of the Bankruptcy Code, as amended, on or against the rights and remedies otherwise available to Lender as provided in this Agreement or in the Loan Documents; or

(b)    any other similar provision of law which results in delaying or prohibiting Lender's right to exercise its rights and remedies under this Agreement and the Loan Documents.

Borrower hereby further agrees: (i) to take and/or consent to any and all action necessary to effectuate such relief from the automatic stay or other provision of law; and (ii) to waive its rights to seek Section 105 injunctions, any other rights, or the filing of a subsequent proceeding by Borrower with respect to any acts by Lender to enforce rights in the Collateral.

6.4    Provided Borrower is vigorously opposing the relief sought, the foregoing consent and waiver shall not apply to an involuntary petition filed against Borrower until and unless a final order for relief is entered; provided, however, that nothing set forth herein shall prevent Lender from seeking relief from the automatic stay or any other relief it desires.

7.    Effectiveness of Agreement. The effectiveness of this Agreement is subject to the satisfaction of the following conditions, whereupon Lender shall have full legal title to the Collateral, free and clear of all liens:

7.1    The execution and delivery of this Agreement by the parties hereto; and

7.2    The receipt by the Lender of a duly executed and delivered General Assignment and Bill of Sale with respect to the Collateral in substantially the form of <u>Exhibit 1</u> hereto and the Patent Assignment Agreement in substantially the form of <u>Exhibit 2</u> hereto.

8.    <u>Voidability of Transactions</u>.  Notwithstanding any term to the contrary herein, in the event the transfer and acceptance of Collateral effectuated hereby is, or is deemed for any reason to be, void or voidable, any agreement to deem or treat the Specified Loans as permanently extinguished, cancelled, or released hereunder shall be null and void.

9.    <u>No Assumption of Liabilities; Creditor Payments</u>.  Lender is not assuming, shall not be deemed to assume, and shall not be responsible or liable for, and Borrower shall retain its respective direct or indirect debts, obligations, and liabilities, whether absolute, accrued, contingent, liquidated, or otherwise, and whether due or to become due, asserted or unasserted, or known or unknown.  If Lender, in its sole and absolute discretion, elects to make any payment to any creditor of Borrower, such payment shall not constitute an assumption of any other liabilities by any of the parties.

10.    <u>Taxes</u>.  Any personal property taxes, sales taxes, and transfer taxes arising as a result of the transactions and sales contemplated by this Agreement or any other Transaction Document shall be paid by Borrower, it being understood that Lender shall cooperate in taking advantage of any reasonably available exemption.

11.    <u>Waiver/Release of Claims by Borrower</u>.  BORROWER DOES HEREBY ACKNOWLEDGE THAT IT HAS NO DEFENSE, COUNTERCLAIM, OFFSET, CROSS COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT CAN BE ASSERTED TO REDUCE OR ELIMINATE ALL OR ANY PART OF ITS LIABILITY TO REPAY ANY LOANS OR EXTENSIONS OF CREDIT FROM LENDER TO BORROWER UNDER THE NOTE OR THE OTHER LOAN DOCUMENTS OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM LENDER.  BORROWER DOES HEREBY VOLUNTARILY AND KNOWINGLY RELEASE AND FOREVER DISCHARGE LENDER, BRANDON FREEMAN, CRYSTAL MOORE, AND EACH OF THEIR RESPECTIVE AGENTS, ATTORNEYS, EMPLOYEES, SUCCESSORS, ASSIGNS, HEIRS, EXECUTORS, ADMINISTRATORS, DESCENDANTS, AFFILIATES, OR ANY OF THEIR AFFILIATES' PAST, PRESENT, AND FUTURE AGENTS, EMPLOYEES, ATTORNEYS, SUCCESSORS, ASSIGNS, HEIRS, EXECUTORS, ADMINISTRATORS, DESCENDANTS, OR ANY OTHER PERSON OR ENTITY INCLUDING ANY ENTITY (OTHER THAN ANY ENTITY OWNED BY BORROWER) OWNED OR CONTROLLED DIRECTLY OR INDIRECTLY OR THAT IS UNDER COMMON CONTROL OF LENDER, BRANDON FREEMAN, OR CRYSTAL MOORE (EACH A "<u>RELEASEE</u>"), FROM ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES, AND LIABILITIES WHATSOEVER, KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT, OR CONDITIONAL, AT LAW OR IN EQUITY, ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE THIS AGREEMENT IS EXECUTED, WHICH BORROWER MAY NOW OR HEREAFTER HAVE AGAINST ANY RELEASEE, IF ANY, AND IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS, OR OTHERWISE, AND ARISING FROM ANY ACTIONS TAKEN WITH RESPECT TO BORROWER OR ANY CREDIT ACCOMMODATIONS UNDER THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THE LOAN DOCUMENTS, ANY ACTIONS RESULTING FROM BRANDON FREEMAN OR CRYSTAL MOORE

SERVING AS DIRECTOR FOR BORROWER, AND NEGOTIATION FOR AND EXECUTION OF THIS AGREEMENT OR ANY PREVIOUS AMENDMENTS. INCLUDED WITHIN THIS RELEASE AND WAIVER ARE ALL CLAIMS AND DEFENSES BASED ON WAIVER (OTHER THAN AS EXPRESSLY PROVIDED PURSUANT TO A WRITTEN INSTRUMENT SIGNED BY LENDER), FRAUD, MISTAKE, DURESS, USURY, FAILURE OR LACK OF CONSIDERATION, CAPACITY OR AUTHORIZATION, UNENFORCEABILITY OF AGREEMENTS, SURETYSHIP RIGHTS AND DEFENSES, EQUITABLE SUBORDINATION, CONFLICTS OF INTEREST, SELF DEALING, BREACH OF DUTY (FIDUCIARY OR OTHERWISE), FAILURE TO ACT IN A COMMERCIALLY REASONABLE MANNER OR IN A MANNER CONSISTENT WITH GOOD FAITH AND FAIR DEALING, AND/OR ANY OTHER CLAIM OF SO-CALLED "LENDER LIABILITY".

12.    Irrevocable Power of Attorney.  Borrower hereby grants to the Lender, and any officer or employee thereof, and with full power of substitution, an **IRREVOCABLE** power of attorney ("Power of Attorney"), coupled with an interest, with full authority in the place and stead of Borrower and in the name of Borrower, from time to time in the discretion of Lender, to take any action and to execute any document, agreement, certificate, and other instrument that Lender may deem reasonably necessary to exercise any of the rights of Lender granted under or in connection with this Agreement or to further or effectuate control over the Collateral.  This Power of Attorney shall remain in effect in perpetuity and, for the avoidance of doubt, shall survive any dissolution or winding up of Borrower.

13.    Further Assurances.  The parties hereto covenant and agree that, at any time from and after the execution and delivery of this Agreement, they shall, from time to time, promptly execute, deliver and file any and all documents and instruments as are reasonably necessary, desirable, or requested by Lender to implement the terms of this Agreement.  Borrower further agrees to provide reasonable access to all books and records to Lender and its successors and assigns, whether or not related to the Collateral, for purposes of effectuating the transactions set forth herein and as otherwise reasonably requested by them.

14.    Entire Agreement.  This Agreement and the other Transaction Documents represent the final agreement among the parties hereto with respect to its subject matter, and may not be contradicted by evidence of prior or contemporaneous oral agreements among the parties. There are no oral agreements among the parties with respect to the subject matter of this Agreement or the other Transaction Documents.

15.    Successors and Assigns.  This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns.  Notwithstanding the foregoing or anything herein to the contrary, Borrower may not assign any portion of this Agreement or any other Transaction Document without Lender's advance written consent. Any purported assignment in violation of this Section shall be void *ab initio*.

16.    Governing Law.  This Agreement shall be governed by and construed in accordance with the law of the State of Delaware applicable to contracts made and to be performed within such state.

17.    CONSENT TO JURISDICTION / WAIVER OF JURY TRIAL. THE PARTIES CONSENT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE STATE OF DELAWARE, AND IRREVOCABLY AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS. EACH PARTY TO THIS AGREEMENT EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS*.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT.

18.    <u>Good Faith and Consultation with Legal Counsel</u>.  This Agreement has been jointly drafted by the parties hereto at arms' length and Borrower has had access to and the opportunity to consult with independent legal counsel. Each of the parties to this Agreement acknowledges having read all of the terms of this Agreement and enters into this Agreement voluntarily and without duress.

19.    <u>Modification; Waiver</u>.  This Agreement may be amended, modified, or waived only in a writing signed by all parties hereto.

20.    <u>Severability</u>.  In the event that any one or more of the provisions of this Agreement shall be for any reason invalid, illegal, or unenforceable in any respect, the invalidity, illegality, or unenforceability shall not affect any other provision of the Agreement and such invalid, illegal, or unenforceable provision shall be treated as if it had never been contained herein; <u>provided,</u> <u>however,</u> this Agreement shall remain binding on the parties hereto only to the extent that the general intent of such parties can be carried out in all material respects.

21.    <u>Counterparts</u>.  This Agreement may be executed electronically (including via facsimile or electronic mail) in any number of counterparts, each of which will be deemed an original, but all of which shall together constitute but one and the same instrument.

[Signature pages follow]

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on their behalf by their duly authorized signatories as of the day and year written above.

**BORROWER:**

**DIRECTSTREAM, LLC**

By: _____

Name: Todd Rooke

Title: CEO

[Signature Page to Partial Strict Foreclosure Agreement]

**LENDER**:

**FG SRC LLC**

By: _____

Name: Brandon Freeman

Title: Manager

**<u>EXHIBIT 1</u>**

**Bill of Sale**

## GENERAL ASSIGNMENT AND BILL OF SALE FOR COLLATERAL

DirectStream, LLC, a Delaware limited liability company ("Debtor"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby sell, convey, assign, transfer and deliver to FG SRC LLC, a Delaware limited liability company (together with its successors and assigns, the "Buyer"), pursuant to Section 9-620 and other provisions of the UCC, the Loan Documents and other applicable law, all the right, title and interest of Debtor in and to the Collateral (collectively, the "Property") described on Schedule I hereto. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Sale Agreement (defined below).

EXCEPT AS EXPRESSLY SET FORTH IN THAT CERTAIN AGREEMENT FOR STRICT FORECLOSURE IN PARTIAL SATISFACTION OF OBLIGATIONS, DATED AS OF JANUARY 22, 2020 (THE "SALE AGREEMENT"), BY AND AMONG DEBTOR AND THE BUYER, DEBTOR MAKES NO REPRESENTATION, WARRANTY, COVENANT OR UNDERTAKING, EXPRESS OR IMPLIED, WITH RESPECT TO THE EXISTENCE OF ANY SPECIFIC ITEMS CONSTITUTING THE PROPERTY OR THE QUANTITY THEREOF, OR THE CONDITION, QUALITY, MERCHANTABILITY (IN THE SENSE OF A UCC WARRANTY), FITNESS FOR A PARTICULAR PURPOSE OR VALUE OF THE PROPERTY; AND THE PROPERTY IS SOLD WITHOUT RECOURSE ON AN ABSOLUTE "AS IS, WHERE IS" BASIS.

On or after the date hereof, Debtor shall, at Buyer's sole expense, from time to time at Buyer's reasonable request, execute and deliver such further instruments and take or cause to be taken such other action to carry out the effect, intent and purpose of the conveyance, assignment and transfer to the Buyer hereunder and otherwise in the carrying out of the intent and purposes of this General Assignment and Bill of Sale for Collateral.

Each of the parties hereto further agree that any disputes arising under or in connection with this General Assignment and Bill of Sale for Collateral shall be subject to the venue, jurisdiction, choice of law, and jury waiver provisions of the Sale Agreement, all as if set forth therein.

[signature pages follow]

Dated this 22nd day of January, 2020.

**DIRECTSTREAM, LLC**

By:_____

Name: Todd Rooke

Title:CEO

[Signature Page to General Assignment and Bill of Sale]

**FG SRC LLC**

By: _____

Name: Brandon Freeman

Title: Manager

[Signature Page to General Assignment and Bill of Sale]

## SCHEDULE I

The following items and types of property, wherever located, now owned or in the future existing or acquired by Debtor, and all proceeds and products thereof, and any substitutes or replacements therefor (collectively, the "Collateral"):

(a) All personal property and fixture property of every kind and nature including, without limitation, all accounts, contract rights, chattel paper (whether tangible or electronic), bills of lading, including electronic bills of lading, goods (including, without limitation, inventory, merchandise, raw materials, goods in process, finished goods, equipment, fixtures, machinery, vehicles, and any accessions thereto), software, instruments, investment property, documents, deposit accounts, money, commercial tort claims, letters of credit or letter-of-credit rights, supporting obligations, tax refunds, and general intangibles (including payment intangibles);[2]

(b) All rights, titles, and interests of Debtor in and to all promissory notes and other instruments payable to Debtor;

(c) (i) all copyrights (whether statutory or common law, registered or unregistered), works protectable by copyright, copyright registrations, copyright licenses, and copyright applications of Debtor; (ii) all renewals, extensions, and modifications thereof; (iii) all income, licenses, royalties, damages, profits, and payments relating to or payable under any of the foregoing; (iv) the right to sue for past, present, or future infringements of any of the foregoing; (v) all other rights and benefits relating to any of the foregoing throughout the world; and (vi) all goodwill associated with and symbolized by any of the foregoing, in each case, whether now owned or hereafter acquired by Debtor ("Copyrights");

(d) (i) all patents, patent applications, patent licenses, and patentable inventions of Debtor; (ii) all continuations, divisions, renewals, extensions, modifications, substitutions, reexaminations, continuations-in-part, or reissues of any of the foregoing; (iii) all income, royalties, profits, damages, awards, and payments relating to or payable under any of the foregoing; (iv) the right to sue for past, present, and future infringements of any of the foregoing; (v) all other rights and benefits relating to any of the foregoing throughout the world; and (vi) all goodwill associated with any of the foregoing, in each case, whether now owned or hereafter acquired by Debtor ("Patents");

(e) (i) all trademarks, trademark licenses, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, certification marks, collective marks, logos, other business identifiers, prints, and labels on which any of the foregoing have appeared or appear, all registrations, recordings, and applications thereof; (ii) all reissues, extensions, and renewals thereof; (iii) all income, royalties, damages, and payments now or hereafter relating to or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements of any of the foregoing; (iv) the right to sue for past, present, and future infringements of any of the foregoing; (v) all rights corresponding to any of the foregoing throughout the world; and (vi) all goodwill associated with and symbolized by any of the foregoing, in each case, whether now owned or hereafter acquired by Debtor ("Trademarks", and collectively with the Copyrights and the Patents, the "Intellectual Property");

(f) Any and all material deposit accounts, bank accounts, investment accounts, or securities accounts, now owned or hereafter acquired or opened by Debtor, and any account which is a replacement or substitute for any of such accounts, together with all monies, instruments, certificates, checks, drafts, wire transfer receipts, and other property deposited therein and all balances therein;

---

[2] Notwithstanding this paragraph (a), solely for purposes of this Agreement, the definition of Collateral and all references thereto shall not include any ownership interest of the Borrower in DirectStream Federal, LLC.

(g) All present and future distributions, income, increases, profits, combinations, reclassifications, improvements, and products of, accessions, attachments, and other additions to, tools, parts, and equipment used in connection with, and substitutes and replacements for, all or part of the Collateral described above;

(h) All present and future accounts, contract rights, general intangibles, chattel paper, documents, instruments, cash and noncash proceeds, and other rights arising from or by virtue of, or from the voluntary or involuntary sale or other disposition of, or collections with respect to, or insurance proceeds payable with respect to, or proceeds payable by virtue of warranty or other claims against the manufacturer of, or claims against any other Person with respect to, all or any part of the Collateral heretofore described in this clause or otherwise; and

(i) All present and future security for the payment to any Person of any of the Collateral described above and goods which gave or will give rise to any such Collateral or are evidenced, identified, or represented therein or thereby.

**EXHIBIT 2**

**Patent Assignment Agreement**

**Patent Assignment Agreement**

THIS PATENT ASSIGNMENT AGREEMENT is entered into on January 22, 2020 by and between DirectStream LLC, a Delaware limited liability company (Assignor) and FG SRC LLC, a Delaware limited liability company (Assignee).

**WHEREAS**, Assignor is the sole and exclusive owner of the U.S. Patents and pending patent applications identified in Schedule A (the "**Patents**"); and

**WHEREAS**, Assignee desires to acquire all rights, title and interest in and to the Patents;

NOW, THEREFORE, the parties agree as follows:

1. **Assignment**. Be it known that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby irrevocably conveys, transfers, and assigns to Assignee, and Assignee hereby accepts, all of Assignor's right, title, and interest in and to the following

    (a) the patents and patent applications set forth in Schedule A hereto and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations, and renewals thereof (the "**Patents**");

    (b) all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world;

    (c) any and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing, past, present and future; and

    (d) any and all claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

2. **Covenants**. Assignor covenants and agrees and warrants that it has a full and unencumbered title to the invention hereby assigned, and further covenants and agrees that it has the right to grant such rights to said Patents and that it will, at any time upon request without cost or further compensation, execute and deliver any and all papers or instruments that, in the opinion of the Assignee, may be necessary or desirable to secure

said Assignee the full enjoyment of the rights and properties herein conveyed or intended to be conveyed by this instrument.

3. **Recordation and Further Actions**. Assignor hereby authorizes the Commissioner for Patents in the United States Patent and Trademark Office to record and register this Patent Assignment upon request by Assignee. Following the date hereof, Assignor shall take such steps and actions, and provide such cooperation and assistance to Assignee and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be necessary to effect, evidence, or perfect the assignment of the Assigned Patents to Assignee, or any assignee or successor thereto.

4. **Counterparts**. This Patent Assignment Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this Patent Assignment Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Patent Assignment Agreement.

5. **Successors and Assigns**. This Patent Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6. **Governing Law**. This Patent Assignment and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based upon, arising out of, or relating to this Patent Assignment Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the United States and the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the Delaware or any other jurisdiction).

IN WITNESS WHEREOF, Assignor has duly executed and delivered this Patent Assignment as of the date first above written.

AGREED TO AND ACCEPTED:

**DirectStream, LLC**

Signature:_____
          Todd Rooke, CEO

Date: January 22, 2020


AGREED TO AND ACCEPTED:

**FG SRC, LLC**


Signature:_____
          Brandon Freeman, Manager

Date: January 22, 2020

4835-8327-4159 v.4

IN WITNESS WHEREOF, Assignor has duly executed and delivered this Patent Assignment as of the date first above written.

AGREED TO AND ACCEPTED:

**DirectStream, LLC**

Signature:_____
            Todd Rooke, CEO

Date: January 22, 2020

AGREED TO AND ACCEPTED:

**FG SRC, LLC**

Signature:_____
            Brandon Freeman, Manager

Date: January 22, 2020

## Schedule A

| Jurisdiction | Title | Status | Patent No./Serial No. | Issued/Filing Date |
|---|---|---|---|---|
| U.S. | System and method for dynamic priority conflict resolution in a multi-processor computer system having shared memory resources | Issued | 6,026,459 | 2/15/2000 |
| U.S. | Multiprocessor computer architecture incorporating a plurality of memory algorithm processors in the memory subsystem | Issued | 6,076,152 | 6/13/2000 |
| U.S. | Multiprocessor computer architecture incorporating a plurality of memory algorithm processors in the memory subsystem | Issued | 6,247,110 | 6/12/2001 |
| U.S. | Split directory-based cache coherency technique for a multi-processor computer system | Issued | 6,295,598 | 9/25/2001 |
| U.S. | Multiprocessor with each processor element accessing operands in loaded input buffer and forwarding results to FIFO output buffer | Issued | 6,339,819 | 1/15/2002 |
| U.S. | System and method for accelerating web site access and processing utilizing a computer system incorporating reconfigurable processors operating under a single operating system image | Issued | 6,434,687 | 8/13/2002 |
| U.S. | System and method for semaphore and atomic operation management in a multiprocessor | Issued | 6,594,736 | 7/15/2003 |
| U.S. | Bandwidth enhancement for uncached devices | Issued | 6,836,823 | 12/28/2004 |
| U.S. | Efficiency of reconfigurable hardware | Issued | 6,941,539 | 9/6/2005 |
| U.S. | Multiprocessor computer architecture incorporating a plurality of memory algorithm processors in the memory subsystem | Issued | 6,961,841 | 11/1/2005 |
| U.S. | System and method for partitioning control-dataflow graph representations | Issued | 6,964,029 | 11/8/2005 |
| U.S. | Process for converting programs in high-level programming languages to a unified executable for hybrid computing platforms | Issued | 6,983,456 | 1/3/2006 |
| U.S. | System and method for providing an arbitrated memory bus in a hybrid computing system | Issued | 6,996,656 | 2/7/2006 |
| U.S. | Computer system architecture and memory controller for close-coupling within a hybrid processing system utilizing an adaptive processor interface port | Issued | 7,003,593 | 2/21/2006 |
| U.S. | System and method for explicit communication of messages between processes running on different nodes in a clustered multiprocessor system | Issued | 7,124,211 | 10/17/2006 |
| U.S. | Map compiler pipelined loop structure | Issued | 7,134,120 | 11/7/2006 |
| U.S. | System and method of enhancing efficiency and utilization of memory bandwidth in reconfigurable hardware | Issued | 7,149,867 | 12/12/2006 |

| Jurisdiction | Title | Status | Patent No./Serial No. | Issued/Filing Date |
|---|---|---|---|---|
| U.S. | Interface for integrating reconfigurable processors into a general purpose computing system | Issued | 7,155,602 | 12/26/2006 |
| U.S. | Debugging and performance profiling using control-dataflow graph representations with reconfigurable hardware emulation | Issued | 7,155,708 | 12/26/2006 |
| U.S. | Interface for integrating reconfigurable processors into a general purpose computing system | Issued | 7,167,976 | 1/23/2007 |
| U.S. | Switch/network adapter port coupling a reconfigurable processing element to one or more microprocessors for use with interleaved memory controllers | Issued | 7,197,575 | 3/27/2007 |
| U.S. | Multi-adaptive processing systems and techniques for enhancing parallelism and performance of computational functions | Issued | 7,225,324 | 3/29/2007 |
| U.S. | Multiprocessor computer architecture incorporating a plurality of memory algorithm processors in the memory subsystem | Issued | 7,237,091 | 6/26/2007 |
| U.S. | System and method for converting control flow graph representations to control-dataflow graph representations | Issued | 7,299,458 | 11/20/2007 |
| U.S. | Switch/network adapter port for clustered computers employing a chain of multi-adaptive processors in a dual in-line memory module format | Issued | 7,373,440 | 5/13/2008 |
| U.S. | Reconfigurable processor element utilizing both coarse and fine grained reconfigurable elements | Issued | 7,406,573 | 7/29/2008 |
| U.S. | Switch/network adapter port for clustered computers employing a chain of multi-adaptive processors in a dual in-line memory module format | Issued | 7,421,524 | 9/2/2008 |
| U.S. | Switch/network adapter port incorporating shared memory resources selectively accessible by a direct execution logic element and one or more dense logic devices | Issued | 7,424,552 | 9/9/2008 |
| U.S. | Switch/network adapter port coupling a reconfigurable processing element to one or more microprocessors for use with interleaved memory controllers | Issued | 7,565,461 | 7/21/2009 |
| U.S. | Multi-adaptive processing systems and techniques for enhancing parallelism and performance of computational functions | Issued | 7,620,800 | 11/17/2009 |
| U.S. | Switch/network adapter port incorporating shared memory resources selectively accessible by a direct execution logic element and one or more dense logic devices in a fully buffered dual in-line memory module format (FB-DIMM) | Issued | 7,680,968 | 3/16/2010 |
| U.S. | Process for converting programs in high-level programming languages to a unified executable for hybrid computing platforms | Issued | 7,703,085 | 4/20/2010 |

| Jurisdiction | Title | Status | Patent No./Serial No. | Issued/Filing Date |
|---|---|---|---|---|
| U.S. | Dynamic priority conflict resolution in a multi-processor computer system having shared resources | Issued | 7,890,686 | 2/15/2011 |
| U.S. | Elimination of stream consumer loop overshoot effects | Issued | 8,589,666 | 11/19/2013 |
| U.S. | System and method for computational unification of heterogeneous implicit and explicit processing elements | Issued | 8,713,518 | 4/29/2014 |
| U.S. | System and method for computational unification of heterogeneous implicit and explicit processing elements | Issued | 8,930,892 | 1/6/2015 |
| U.S. | System and method for retaining DRAM data when reprogramming reconfigurable devices with DRAM memory controllers | Issued | 9,153,311 | 3/27/2014 |
| U.S. | System and method for retaining dram data when reprogramming reconfigurable devices with DRAM memory controllers incorporating a data maintenance block colocated with a memory module or subsystem | Issued | 9,530,483 | 12/27/2016 |
| U.S. | System and method for retaining DRAM data when reprogramming reconfigurable devices with DRAM memory controllers incorporating a data maintenance block colocated with a memory module or subsystem | Issued | 9,727,269 | 8/8/2017 |
| U.S. | System and method for thermally coupling memory devices to a memory controller in a computer memory board | Issued | 9,848,517 | 12/19/2017 |
| U.S. | Mobile electronic devices utilizing reconfigurable processing techniques to enable higher speed applications with lowered power consumption | Pending | 13/365,090 | 2/2/2012 |
| U.S. | Multi-processor computer architecture incorporating distributed multi-ported common memory modules | Pending | 13/903,720 | 5/28/2013 |

## ADDENDUM TO AGREEMENT FOR STRICT FORECLOSURE
## IN PARTIAL SATISFACTION OF OBLIGATIONS

January 22, 2020

Reference is made to that certain Agreement for Strict Foreclosure in Partial Satisfaction of Obligations (the "***Foreclosure Agreement***") dated as of January 22, 2020, by and among FG SRC LLC, a Delaware limited liability company ("***Lender***") and DirectStream, LLC, a Delaware limited liability company ("***Borrower***"). Further reference is made to that certain Pledge, Assignment, and Security Agreement (the "***Security Agreement***") dated as of February 5, 2016, by and among Borrower and Lender. Pursuant to the terms of the Foreclosure Agreement and Section 9-620 of the Uniform Commercial Code in effect in the State of Delaware as of the date of the Foreclosure Agreement, Borrower agreed to sell, convey, assign, transfer, and deliver to Lender, all of Borrower's right, title, and interest in and to the Collateral (as defined in the Security Agreement) and all proceeds thereof, free and clear of all liens (the "***Transfer***").

Borrower hereby acknowledges that the Collateral (as defined in the Security Agreement) includes the following patent infringement claims: (i) SRC Labs, LLC v. Microsoft Corp., CASE NO. C18-0321JLR (W.D. Wash. Nov. 20, 2018); and (ii) SRC Labs, LLC v. Amazon Web Services, Inc., No. C18-0317JLR (W.D. Wash), Dkt. # 1 (the "***Existing Claims***"). Borrower reconfirms the grant to Lender of a security interest in the Existing Claims and all proceeds thereof, all upon and subject to the terms and conditions of the Security Agreement, including, without limitation, all terms applicable to the Collateral (as defined in the Security Agreement).

In connection with the Transfer by Borrower and acceptance by Lender of the Collateral, Borrower acknowledges and agrees:

1.      The Transfer includes the transfer and assignment of all of Borrower's right, title and interest as plaintiff in the Existing Claims, and all proceeds thereof, to Lender;

2.      Borrower will grant Lender access to all files requested by Lender in connection with the Existing Claims or otherwise necessary to the continuation of the litigation or any settlements of the Existing Claims;

3.      Lender is solely authorized to direct Shore Chan DePumpo LLP (the "***Claims Counsel***") in connection with the pending litigation of the Existing Claims;

4.      Borrower will take all necessary actions and execute any agreements requested by Lender or Claims Counsel that either party deems necessary to maintain the attorney-client privilege between Lender and Claims Counsel with respect to prior and future correspondence regarding the Existing Claims; and

5.      Borrower will take all other actions requested by Lender to authorize Lender to make all decisions regarding the Existing Claims, including any decisions regarding the litigation or any settlements.

Borrower further understands that Lender may provide this Addendum to any party or person it deems necessary to evidence the transfer of the Existing Claims to Lender.

***[Remainder of Page Intentionally Blank.***
***Signature Pages Follow.]***

**EXECUTED** as of the date first written above.

<u>**BORROWER:**</u>

**DIRECTSTREAM, LLC**

By: _____
     Name: Todd Rooke
     Title: CEO

<u>**LENDER:**</u>

**FG SRC LLC**

By: _____
     Name: Brandon Freeman
     Title: Manager

[Signature Page to Addendum]

**EXECUTED** as of the date first written above.

                        **BORROWER:**

                        **DIRECTSTREAM, LLC**

                        By: _____
                             Name: Todd Rooke
                             Title: CEO

                        **LENDER:**

                        **FG SRC LLC**

                        By: _____
                             Name: Brandon Freeman
                             Title: Manager

[Signature Page to Addendum]